# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| **ROBERT ALLEN,** *et al.* | § | |
| | § | |
| **v.** | § | **NO. 4:22-CV-00365-BD** |
| | § | |
| **LEWISVILLE INDEPENDENT** | § | |
| **SCHOOL DISTRICT** | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Robert Allen (who goes by his middle name, Winston, Admin. Rec. of Due-Process Hr'g ("AR") 1026) and his mother Suzette Allen appealed a Texas Education Agency ("TEA") special education hearing officer's decision finding that defendant Lewisville Independent School District ("Lewisville ISD" or "the district") did not violate the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.* Dkt. 1. The Allens also appealed a third-party hearing officer's decision that the district did not violate § 504 of the Rehabilitation Act, 29 U.S.C. § 794. Dkt. 1. The parties filed cross-motions for judgment on the administrative record. Dkts. 34 (the district's motion), 35 (the Allens' motion); *see* Dkts. 38 (the district's response), 39 (the Allens' response), 42 (the district's reply), 43 (the Allens' reply). The court will grant the district's motion, Dkt. 34, deny the Allens' motion, Dkt. 35, and affirm the hearing officers' decisions.

## BACKGROUND

### I. Robert's Record in High School

#### A. Freshman year

In 2018, before Robert's freshman year of high school, the Allens moved from Florida to north Texas. AR 1026. (Because the Allens have the same last name, the court will refer to them individually by their first names.) As a freshman, Robert attended Memorial High School in Frisco, Texas, *id.*, then transferred to The Colony High School, which is a part of Lewisville ISD, AR 1027.

Robert has attention deficit hyperactivity disorder ("ADHD") and dysgraphia, an impairment that affects handwriting. *Id.* His school in Florida afforded him § 504 accommodations, which Memorial High School and The Colony High School later adopted. *Id.* Specifically, Robert was allowed to type lengthy assignments, take extra time to complete tests, and attend tutorials. AR 246. During his freshman year, Robert took a mix of on-level, pre-advanced-placement ("pre-AP"), and advanced-placement ("AP") classes and earned a mix of Cs, Bs, and As, with his lowest grades in pre-AP biology, geometry, and AP chemistry. AR 734.

### B.  Sophomore year

During the fall of his sophomore year, now at The Colony High School, Robert again earned a range of passing grades, with his lowest grade in an advanced course. AR 735. In the spring of 2020, he took pre-AP chemistry and pre-AP algebra II, earning low grades in each of those classes. AR 735.

Suzette contacted Robert's teachers and football coach about his grades. Early in the semester, Robert's math teacher, Tracy Jobst, emailed Suzette to tell her that Robert was failing pre-AP algebra II because he "ha[d] not done any homework nor ha[d] he come in for tutoring." AR 308. But she noted that he still had time to bring his grade up by "doing test corrections, retesting, turning in homework[,] and making sure to come in for tutoring." *Id.* In an email exchange involving Jobst and Suzette, Jobst said that Robert's test grades would have been higher if he had done his homework. Suzette replied that Robert had been telling her, falsely, that he was turning his homework in. AR 318–21. Meanwhile, Suzette forwarded Jobst's original email to Robert's football coach, Rudolph Rangel, asking whether there was any way Rangel or his department could "help get [Robert] back on track." AR 307. Rangel assured Suzette that he was "on it," and she thanked him, stating that Robert just needed "a little push to help motivate him. Lol." *Id.*

About a month later, Robert's chemistry teacher, Laura Banks, emailed Suzette to say that Robert would have to attend a mandatory tutorial but that he is "a great student" and that she wanted "to see him be successful in chemistry." AR 322. Suzette thanked Banks, saying that

Robert's ADHD medicine was "not where it needs to be" and that she would be getting his prescription adjusted. *Id.*

Lewisville ISD divides its semesters into two nine-week grading periods. At the end of the first grading period, Robert was failing algebra and chemistry. AR 735. Jobst reached out to Suzette to tell her that Robert had a failing grade, writing that he had done poorly on his midterm exam and that, although he had still not made up a test, she gave him the same score as his midterm for that test "to help his grade as much as possible." AR 329. Suzette was surprised to learn that Robert was still missing a test, stating that she had never received clear answers when she tried to find out what was still missing. *Id.* She said that some of Robert's absences were due to "health issues" and asked how she could address his grades and, if he failed the course, whether he could re-take it online or be accommodated in some other way. *Id.*

After emailing with Jobst, Suzette contacted Robert's assistant principal, Bradley Willi, to ask "what options [they had] for Algebra [II]." AR 332. The two of them went back and forth about how Robert could improve his grades. AR 330–32. Willi assured her that Robert could still get credit for the semester, and Suzette lamented Robert's "lack of maturity." AR 330. She wondered whether Robert needed counseling but concluded that he ultimately just needed someone "to step in and help explain the consequences to him." *Id.* Suzette and Willi discussed whether Robert should switch to on-level algebra. AR 338. Suzette was "not totally against" it but was concerned that they needed something mandatory to help him catch back up. AR 337. Robert would not be dedicated to optional tutoring, she explained, and would "only do what is required to get the C." *Id.*

Ultimately, Robert switched to on-level chemistry and algebra II. AR 854, 856. To ensure that he did better in the second grading period, Suzette reached out to Rangel again, explaining that Robert had done well in the fall semester only because "the coaches [were] on his tail for eligibility." AR 353. Although Robert continued to not turn in assignments in on-level algebra II and chemistry, AR 365, 368, 371, he eventually passed each class with grades of 84% and 95%, AR 735.

## C.  Junior year

In the fall of his junior year, Robert enrolled only in on-level courses and passed all of them, AR 736, although he continued to have issues with turning assignments in, AR 373–74, 380. But near the end of that semester, the Allens learned that Robert's father had died. AR 384. Suzette asked Willi, Rangel, and another coach to "keep watch over" Robert and his brother, AR 383–84, and to tell their teachers to keep her posted "if anything changes," AR 388. Willi referred Robert to his guidance counselor, Erica Woodall, to help him deal with his grief. AR 816–17. But his teachers and administrators did not raise any red flags and said that Robert "seem[ed] to be doing well." AR 249.

In the spring, Robert enrolled in pre-calculus. AR 736. Although nominally an on-level course, pre-calculus is an advanced math class, one of the more difficult ones Lewisville ISD offers, that most students do not take. AR 974–75. By February 2020, his pre-calculus teacher, Rayce Cooley, contacted Suzette to tell her that Robert was failing that class because he had not made up a test. AR 394. Robert eventually took the test but failed it. AR 398. Cooley attributed that result to waiting five weeks, by which point he had forgotten much of the material. *Id.*

The situation worsened in March. Robert was caught cheating on a test and received no credit for it. AR 395. By that point, nine missing assignments were also dragging his grade down. AR 398. After that, he missed two more pre-calculus tests. AR 403. Robert ultimately failed that class, AR 736, but he passed the other classes he took that semester and later passed pre-calculus in summer school, AR 736, 738, 993.

## D.  Senior year

Over the summer of 2021, Suzette emailed Robert's coaches to say that he had been taking his dad's death hard around Father's Day, AR 409, and that she was taking him to be tested for bipolar disorder and depression, AR 410. He was diagnosed with depression and anxiety, AR 155, 166–67, but the Allens did not tell anyone at the school about those diagnoses at that time, *see* AR 919–20, 942, 953.

4

The first nine weeks of Robert's senior year were uneventful. Along with football, he took U.S. government and principles of architecture, comfortably passing both classes. AR 737. But later that semester, he had his first serious disciplinary incident. Another student reported to administrators that Robert had sent her a series of Snapchat messages telling her to leave when he gave a signal; he was going to do something that could get people hurt because he was "tired of this shit." AR 586; *see* AR 598–604. Later, administrators also discovered that he had AirDropped to other students a picture of a message that read: "I could just pull out a gun and nobody would see." AR 587; *see* AR 605. Administrators searched his belongings and did not find any weapons. AR 587. He was subsequently arrested for making a false alarm or report. *Id.*; *see* Tex. Penal Code § 42.06.

Five days later, Robert was assigned to spend 60 days at Lewisville ISD's Disciplinary Alternative Education Program ("DAEP") center for violating the student code of conduct. AR 446, 580. That day, Suzette told Woodall that Robert had been receiving treatment for anxiety and depression. AR 943. But she did not offer any documentation. AR 870, 1015.

The next day, November 18, 2021, Robert began his stint at DAEP, and the school completed a threat-response assessment. AR 580, 610. It noted that, although Robert had "a trauma history and history of psychiatric care" and had expressed distress related to the anniversary of his father's death, he had "not exhibited any symptoms of a major mental illness." AR 613. It found that Robert appeared to have a positive relationship with his teachers and coaches and that Lewisville ISD staff had not expressed concerns about aggression or Robert's potential for violence. AR 615.

Robert's architecture teacher, Lynne Cox, wrote a detailed review of her experience with him. She said that he was "one of the kindest and friendliest students in [her] class." AR 618. In her opinion, he "is a very engaged learner" who "enjoys coming to class and is always one of the first students to arrive and get right to work." AR 620. He seemed to enjoy architecture, "completes assignments in a timely manner," and "usually submits quality work." *Id.* She also emphasized that Robert loves football and "often analyzes games with his other football friends." AR 619. Robert's government teacher likewise wrote that he did not have concerns with Robert's behavior,

AR 621, and both he and Robert's football coach later rated Robert as average in most categories, AR 626–27.

Twelve days into Robert's time at DAEP, the DAEP counselor contacted Suzette and Woodall because Robert had said that he "didn't want to live because he d[id]n't want to deal with this." AR 891. According to the DAEP counselor, it is common for students to make statements like that when they are first assigned to DAEP. AR 902–04. That same day, Suzette notified the district in writing of Robert's depression and anxiety, AR 495–499, though the documentation she provided was not signed by a provider and stated that it was "not a diagnostic instrument" and was "only meant to be interpreted by an experienced clinician in the course of a clinical examination," AR 158. She did not share a letter from Robert's healthcare provider until a week later. AR 167. Robert did not return to a Lewisville ISD school after November 30, 2021. AR 897.

## II. Administrative Proceedings

On the second-to-last day Robert spent in school, Lewisville ISD notified Suzette that it would be conducting a meeting to determine whether Robert's code-of-conduct violation was a manifestation of his ADHD or dysgraphia. AR 252–55. The notice mistakenly indicated that the meeting would occur on the same day but was soon corrected to indicate the next day. AR 471. Suzette objected that she was "still waiting on the evidence" and had "no idea w[hat] th[e] decision [to place Robert in DAEP] was based on," AR 481, so the meeting was postponed, AR 480. On the morning of the rescheduled meeting, Suzette again asked to postpone it because she was checking Robert into the hospital. AR 518–19. Concerned about meeting mandatory timelines, the principal of The Colony High School declined to reschedule the meeting but noted that "once [Robert] is released from inpatient services, if there is a need for an additional . . . meeting to discuss accommodations needed at that point, we can schedule an additional . . . meeting later." AR 518. The committee (referred to as the "Section 504 Committee," AR 250) determined that Robert's code-of-conduct violation was not a manifestation of his ADHD or dysgraphia. AR 250–51.

Two and a half weeks later, Suzette requested a due-process hearing, asserting that Lewisville ISD had violated IDEA. AR 18. Later, she also requested another hearing, asserting that Lewisville ISD had violated the Rehabilitation Act. § 504 Hr'g Rec. ("504 R") 1348–49. Each hearing officer determined that Lewisville ISD had not violated the law. AR 1–17; 504 R 1350.

Between those two hearings, the Section 504 Committee held a second meeting to determine whether Robert's code-of-conduct violation was a manifestation of his depression, anxiety, or food allergies and to reconsider whether it was a manifestation of his ADHD or dysgraphia. 504 R 1311. The Section 504 Committee determined that it was not, 504 R 1313, but that Robert might benefit from additional accommodations, 504 R 1315. The Allens also consented to Lewisville ISD evaluating Robert for special education. 504 R 1307–08. That evaluation eventually led to a determination that Robert was eligible for special education. Additional Evid. ("AE") 49; *see* Dkt. 25 (this court's order granting the Allens' motion to file additional evidence under 20 U.S.C. § 1415(i)(2)(C)(ii)). Two weeks later, the Allens filed this suit seeking damages, injunctive relief, and attorneys' fees. Dkt. 1 (seeking attorneys' fees and "all relief requested of the Special Education Officer"); *see* AR 22–23 (requesting damages and injunctive relief). The parties agree that, even if the Allens' request for injunctive relief is moot, their request for damages remains live. Dkts. 48 at 1–2, 49 at 1–3.

### III. The Parties' Motions for Judgment

The Allens and the district each moved for judgment on the administrative record. Dkts. 34, 35. The Allens argue that it is "virtually undisputed" that Robert was eligible for special education under IDEA, so the only remaining question is whether the district violated its "child find" duties. Dkt. 35 at 4; *see* 20 U.S.C. § 1412(a)(3) (conditioning federal funds on States having in effect "policies and procedures to ensure that" "[a]ll children with disabilities . . . who are in need of special education and related services . . . are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services").

The Allens assert that, at some point in the years before they filed their administrative complaint, the district was put on notice that Robert needed special education and should have evaluated him for special education. Dkt. 35 at 5–17. They argue that the district did not evaluate Robert for special education within a reasonable time after they were put on notice that he needed special education and that the delay denied him a free appropriate public education ("FAPE"). *Id.* at 17–22; *see* 20 U.S.C. § 1401(9) (defining a FAPE as "special education and related services that" meet four statutory conditions). They further assert that the district violated its duty to determine whether Robert's code-of-conduct violation was a manifestation of his disability by conducting a hearing without Suzette and outside of permissible timeframes. Dkt. 35 at 22–26; *see* 20 U.S.C. § 1415(k)(5)(A) (requiring districts to evaluate certain students who commit code-of-conduct violations to determine whether the violations are manifestations of their disabilities).

As to the first of those points, the district responds that its child-find obligations were never triggered because it had no reason to suspect that Robert needed special education, Dkt. 34 at 18–22—and that, even if its child-find obligations were triggered, it was not further obligated to evaluate Robert for special education before the Allens consented to an evaluation. *Id.* at 22–23. As to the Allens' second point, the district argues that Robert was not entitled to a manifestation review for the same reason. *Id.* at 23–24.

The parties also moved for judgment on the Allens' Rehabilitation Act claim. As to that claim, the Allens argue that no genuine dispute of material fact exists because Robert was eligible for special education throughout his sophomore, junior, and senior years and was not placed in special education, which denied him a FAPE. Dkt. 35 at 26–27. The district argues that Robert received a FAPE because he "achieved success in the District academically, behaviorally and socially" and had no "significant behaviors until" his code-of-conduct violation. Dkt. 34 at 26–27.

8

## LAW

### I.  IDEA

IDEA requires a State receiving federal education funds to ensure that all children with disabilities in the State have access to a FAPE and to abide by procedures designed to fulfill that commitment. 20 U.S.C. §§ 1412(a), 1415(a); *see also Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 183 (1982) (explaining that IDEA "leaves to the States the primary responsibility for developing and executing educational programs for handicapped children" but "imposes significant requirements to be followed in the discharge of that responsibility"). To achieve those ends, States must offer "special education and related services, including instruction tailored to meet a child's unique needs and sufficient support services to permit the child to benefit from that instruction." *A. J. T. v. Osseo Area Schs., ISD No. 279*, 605 U.S. 335, 340 (2025) (cleaned up).

IDEA also established dispute-resolution procedures for use when parents and schools do not agree about whether a child has been provided a FAPE. *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 159 (2017). Those procedures have several steps. First, an aggrieved parent must file a complaint with the appropriate educational agency (in Texas, a "school district[] [or] residential facilit[y]," Tex. Educ. Code § 29.012(d)(1); *see Zapata v. Hays Cnty. Juv. Det. Ctr.*, No. 23-50191, 2023 WL 7870596, at *3 (5th Cir. Nov. 15, 2023)), alleging that the school district failed to adequately identify or evaluate the child, provided an inappropriate educational placement, or did not provide a FAPE. 20 U.S.C. § 1415(b)(6). After that, the school district will convene a preliminary meeting with the parent and relevant staff. *Id.* § 1415(f)(1)(B)(i). If that meeting fails to resolve the dispute, the district and the parent may opt to mediate, *id.* § 1415(e), or proceed to a hearing, *id.* § 1415(f)(1)(A), before an impartial officer, *id.* § 1415(f)(3)(A). If, after the hearing, the parent remains discontent, she may appeal the hearing officer's decision to a state court or a federal district court. *Id.* § 1415(i)(2)(A); *see also id.* § 1415(g) (providing for additional administrative review in States, unlike Texas, that have two tiers of hearings); 19 Tex. Admin. Code § 89.1151(b) (providing that "[t]he Texas Education Agency will implement a one-tier system of hearings"). In

that forum, the plaintiff has the burden to prove that the school district violated IDEA and that the violation deprived the student of a FAPE. *Schaffer v. Weast*, 546 U.S. 49, 57 (2005); *Cypress–Fairbanks ISD v. Michael F.*, 118 F.3d 245, 248 (5th Cir. 1997).

The Fifth Circuit has described the court's review of a hearing officer's decision as "virtually *de novo*." *Adam J. v. Keller ISD*, 328 F.3d 804, 808 (2003). The court must base "its decision on the preponderance of the evidence," considering the administrative record and any additional evidence it admits at the request of either party. 20 U.S.C. § 1415(i)(2)(C). And although it should accord the hearing officer's decision "due weight," the court "must ultimately reach an independent decision." *Michael F.*, 118 F.3d at 252. It may even consider evidence of matters that occurred after the hearing officer's decision. *Id.*

## II. Rehabilitation Act

Section 504 of the Rehabilitation Act makes it illegal for an entity receiving federal funds to exclude a person with a disability from participation in or the benefits of a federal program or to discriminate against that person under such a program "solely by reason of her or his disability." 29 U.S.C. § 794(a). "In addition to [its] . . . prohibition[] of disability-based discrimination, . . . the Rehabilitation Act impose[s] upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). In the education context, that means that school districts must offer children with disabilities FAPEs. 34 C.F.R. § 104.33(a).

Section 504's administrative-review procedures are less detailed than IDEA's. A school district must offer "a system of procedural safeguards that includes notice, an opportunity for the parents or guardian of the [student in need of special education] to examine relevant records, an impartial hearing with opportunity for participation by the [student]'s parents or guardian and representation by counsel, and a review procedure." 34 C.F.R. § 104.36. Although "review procedure" is not defined, the statute creates a private right of action. *See Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011); Mark C. Weber, *Procedures and Remedies Under Section 504 and the ADA for Public School Children with Disabilities*, 32 J. Nat'l Ass'n Admin. L. Judiciary

611, 638 (2012) (noting the scholarly debate over whether "a review procedure" refers to administrative or judicial review but explaining that the court's federal-question jurisdiction permits judicial review either way).

Because challenges under § 504 are brought as original proceedings, rather than appeals, the court applies the ordinary summary-judgment standard. *Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Ross*, 486 F.3d 267, 278 (7th Cir. 2007). That familiar standard requires the movant to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if, under the governing substantive law, it could affect the outcome of the suit, and a fact issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Although the court must resolve all reasonable doubts in the nonmovant's favor, *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. Unit B Sept. 1981), "[c]onclusional allegations and denials, speculation, and unsupported assertions are insufficient to avoid summary judgment," *Sanches v. Carrollton-Farmers Branch ISD*, 647 F.3d 156, 165 (5th Cir. 2011).

When presented with cross-motions for summary judgment, the court considers "each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Morgan v. Plano ISD*, 589 F.3d 740, 745 (5th Cir. 2009). "[E]ach movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538–39 (5th Cir. 2004). Summary judgment is appropriate on cross-motions "[i]f there is no genuine issue and one of the parties is entitled to prevail as a matter of law." *Id.* at 539.

## DISCUSSION

### I. IDEA

As noted, the Allens contend that it is "virtually undisputed" that Robert was eligible for special education under IDEA. Dkt. 35 at 4. They base that assertion on an evaluation the district

conducted, after the underlying due-process hearings and after Robert stopped attending school, that resulted in a finding of eligibility. AE 49.

That evaluation, conducted by an admission, review, and dismissal ("ARD") committee, indicates that Robert's "Primary Condition" is autism, an impairment that no one previously contended he had. AE 47, 49; *see* AE 60 (referring to the "ARD Committee"); *see also* 18 Tex. Admin. Code § 89.1050 (instructing school districts to establish ARD committees); *id.* § 89.1055 (tasking ARD committees with developing individualized education programs). It also indicates that Robert's "Secondary Condition" is "Emotional Disturbance," his "Tertiary Condition" is ADHD, and that he has "Dysgraphia" and a "Speech Impairment." AR 47, 49. But the recommendations that the ARD committee made all relate to ADHD and dysgraphia. AE 50–53. Indeed, the recommendations aligned closely with the accommodations that Robert was already authorized to receive without special education. *Compare* AE 52–53 *with* 504 R 1315. The only meaningful difference is that the ARD committee recommended that Robert receive instruction remotely, AE 56, a format that Suzette had indicated was ineffective during the COVID-19 pandemic, AR 365, 368, 375, 379.

It is unclear why the ARD committee found Robert eligible for special education based on an impairment he has not been diagnosed with, recommended accommodations unrelated to that impairment, and suggested a learning format that had not served him well. Perhaps significant is that some of the information that the ARD committee apparently received from Suzette conflicts with the record evidence. *Compare* AE 51 (noting that Suzette "feels [Robert] has motivation to maintain consistent good grades") *with* AR 353, 379 (reflecting Suzette's belief that Robert's poor grades were due to a lack of motivation); *see* AR 320, 336, 368 (attributing Robert's grades to a lack of accountability), 330 (attributing Robert's grades to a lack of maturity).

In any event, the district does not deny that Robert was ultimately found eligible for special education. It correctly asserts, however, that the Allens have failed to meet their burden to show an IDEA violation.

Judicial review under IDEA follows a two-step framework. First, the court asks "whether the state or local agency complied with the procedures set forth in" IDEA. *Michael F.*, 118 F.3d at 248. If it answers that question affirmatively, it then determines whether the procedural violation deprived the child of a FAPE. *Id.*; *see E.R. v. Spring Branch ISD*, 909 F.3d 754, 766 (5th Cir. 2018) (explaining that "procedural defects alone do not constitute a violation of the right to a FAPE unless they result in the loss of an educational opportunity" (quoting *Adam J.*, 328 F.3d at 812)). That inquiry turns on whether the child "receive[d] meaningful educational benefits." *Lauren C. v. Lewisville ISD*, 904 F.3d 363, 371 (5th Cir. 2018). The Allens argue that the district failed to satisfy its child-find and expedited-evaluation duties. Each of those arguments fails.

## A.  Child-find duty

The district's child-find duty requires it to ensure that "[a]ll children with disabilities . . . who are in need of special education and related services . . . are identified, located, and evaluated . . . to determine which children with disabilities are currently receiving needed special education and related services." 20 U.S.C. § 1412(a)(3)(A); *see id.* § 1401(3)(A) (defining a "child with a disability" as one with any of a list of impairments "who, by reason thereof, needs special education and related services"). The Fifth Circuit "has inferred a 'reasonable-time standard' into the provision," requiring the district to evaluate students for special education "within a reasonable time after [it] is on notice of facts or behavior likely to indicate a disability." *Spring Branch ISD v. O.W.*, 961 F.3d 781, 791 (2020) (quoting *Krawietz v. Galveston ISD*, 900 F.3d 673, 676 (5th Cir. 2018)).

If that evaluation results in a determination that a child is a child with a disability, the school district must create and implement a plan to provide special education adequate to provide the child with a FAPE. That plan, called an "individualized education program" ("IEP"), 20 U.S.C. § 1414(d), must be "reasonably calculated to enable the student to receive educational benefits." *Klein ISD v. Hovem*, 690 F.3d 390, 396 (5th Cir. 2012). But a court reaches the question of whether a school district denied a child a FAPE only if the court concludes that the school district violated its child-find duties or another procedural duty. *Michael F.*, 118 F.3d at 248.

13

The Allens argue that Robert's grades and emotions should have triggered the district's child-find duties. If not those, then Suzette's email messages or a revision to a TEA handbook should have. None of those arguments has merit.

### 1. The normalcy of Robert's high-school experience

Citing *D.C. v. Klein Independent School District*, 860 F. App'x 894, 901 (5th Cir. 2021), the Allens argue that the district's child-find duty is triggered if a student with a qualifying impairment "was struggling academically at any point." Dkt. 35 at 5–6. In *D.C.*, the Fifth Circuit noted that "a school district generally has sufficient notice" that a child has a qualifying disability "if it is aware of facts suggesting the child has a disability and that the child is struggling academically." *D.C.*, 860 F. App'x at 901. The Allens read too much into that statement.

As the *D.C.* court observed, a child's academic performance is often instructive. But "there is no bright-line rule." *Id.* The ultimate question remains whether "the district 'had reason to suspect [the child] had a qualifying disability.'" *Id.* at 900–01 (quoting *Dall. ISD v. Woody*, 865 F.3d 303, 320 (5th Cir. 2017)). In other words, the district's child-find duty is triggered when it has reason to suspect that a child with an impairment "needs special education and related services." 20 U.S.C. § 1401(3)(A)(ii). And there of course must be a connection between the child's impairment and his academic struggle. *El Paso ISD v. Richard R.*, 567 F. Supp. 2d 918, 950 (W.D. Tex. 2008). It would not be correct to say that the child-find duty is triggered if, for instance, a student a with a visual impairment that requires homework assignments to be printed in an oversized font struggles only because he neglects to turn in homework assignments printed on forms specially designed for him and that he has no difficulty reading. *See Durbrow v. Cobb Cnty. Sch. Dist.*, 887 F.3d. 1182, 1195 (11th Cir. 2018) ("agree[ing] with the district court that [a student pursuing an IDEA claim] did not suffer from an inability to concentrate and progress academically, but rather neglected his studies" and "add[ing] that special education is generally ill-suited for students who are making academic progress while neglecting to complete their work").

The parties agree that Robert has a qualifying impairment but dispute whether the district had reason to believe that he needed special education because of it. The Allens portray Robert as a

14

failing student whose poor academic performance showed that accommodations were not enough. In particular, they note Robert's grades in pre-calculus (which he failed), algebra II and chemistry (which he failed for the first half of the semester), and English (which he passed). Dkt. 35 at 7. There was nothing out of the ordinary about those grades.

In seven semesters, Robert failed only one class—pre-calculus—for the entire semester. AR 734–37. Although he re-took the class and passed it, AR 738, Cooley was not shocked that he struggled the first time, AR 975. Pre-calculus at The Colony High School is an advanced math class that most students never take—one of the hardest in the school. AR 974–75. When students do take that class, many of them struggle with it. AR 975. True, Robert also failed pre-AP algebra II and pre-AP chemistry for the first half of the semester. AR 735. But when he switched to on-level algebra II and chemistry, he passed each comfortably. *Id.* Although the Allens focus on Robert's failure of classes or parts of classes, he failed only sporadically in advanced classes. The district was not required to evaluate for special education every student who was not at the top of his or her class, and it is not uncommon for a high-school student to fail a class.

Nor was it out of character for Robert to fail those classes. Although pre-calculus, chemistry, and algebra II were the classes in which Robert performed worst, they were not his first brush with failure. When he was enrolled in Frisco ISD, he came within three points of failing a grading period six times. AR 734. And he did fail a grading period in pre-AP biology. *Id.* In Lewisville ISD, he came within three points of failing a grading period in AP world history and theatre, AR 735, and in physics and Spanish he failed his exams but ultimately passed both of those classes, AR 736.

It was also not surprising that Robert failed math and science classes. At Memorial High School, biology and geometry were two of his lowest grades. AR 734. And at The Colony High School, he earned relatively low marks in physics. AR 736. Given that, the district should not have been surprised to see that he did not excel in pre-AP algebra II; pre-calculus; and pre-AP chemistry, a math-heavy science. *See* AR 857. Jobst recognized as much. When Robert enrolled in her class, she looked to his earlier grades and told Willi and another administrator that he "doesn't look like a strong math student" and her class "may be a challenge." AR 284–85. Those results are not

15

enough to trigger the district's child-find duty when Robert was otherwise performing adequately, passed his STAAR exams, and was advancing at a normal rate. *See Leigh Ann H. v. Riesel ISD*, 18 F.4th 788, 791–92, 796–97 (5th Cir. 2021) (finding that a child was "an average student" because he failed only some of the time and passed most of his STAAR exams); *see also STAAR*, Tex. Educ. Agency, https://tea.texas.gov/student-assessment/staar (explaining the "State of Texas Assessments of Academic Readiness (STAAR[])").

That conclusion is consistent with the testimony. During the hearing, Robert's teachers and administrators were repeatedly asked if they saw anything concerning about Robert academically, socially, or behaviorally. Every one of them testified that he or she did not. *E.g.*, AR 810, 812, 866, 871–72, 922–23, 974–75, 980, 983, 997. As they saw it, Robert was "a very typical common high school student." AR 857. It is "very typical" to struggle with pre-calculus, AR 864, and "not uncommon . . . for students in their sophomore year to begin to struggle in their classes and particularly with Algebra II and with Chemistry," AR 857. And to the extent he struggled, it was because he failed to turn in assignments or make up tests (not just for a little while, but for weeks at a time, up to the end of the semester), failed to attend tutoring, and got caught cheating. *See* AR 975–77, 980.

To the extent the Allens argue that Robert's struggles with COVID-19 should have put the district on notice of facts or behavior likely to indicate that Robert was a child with a disability, *see* Dkt. 35 at 21, that argument also fails. As the district noted, the pandemic was a unique situation in which many students would have been expected to struggle. Dkt. 38 at 7. Although one of Robert's teachers feared that, if the district went to "pass[/]fail," he would "get credit and know nothing," the concern was that Robert would neglect his classes, not that he might need special education. AR 351. In any event, that concern was apparently misplaced. Robert performed better in that grading period than in the one before, perhaps because he switched to on-level classes. AR 735.

As to any potential emotional disturbance, the record reflects a similar story. Naturally, Robert struggled with his father's death. But grief is "a human experience." AR 959. And his diagnoses

16

of depression and anxiety, even after the district eventually learned of them, were alone insufficient to trigger its child-find duties. *William V. v. Copperas Cove ISD*, 774 F. App'x 253, 253 (5th Cir. 2019) (per curiam). The Allens must also establish that, because of those impairments, Robert needed special education. *Id.* They have not done so. None of Robert's teachers or counselors observed anything that they considered out of the ordinary. *E.g.*, AR 907–08, 983, 1006. To the contrary, one of them described Robert as a "delightful student." AR 620.

The court cannot say that the district had reason to suspect that Robert needed special education when "year after year the teachers report[ed,] academically[,] he's average. . . . Behaviorally, socially[,] and emotionally[,] time and time again, year after year[,] there is a consistent picture that's built that no one had … the suspicion that he had an emotional disturbance or anxiety or any disability that . . . [it would need] to evaluate under IDEA." AR 1006 (testimony of Dr. Kathy Talbert, Lewisville ISD's chief executive director of special education). The Allens have not met their burden to show otherwise by a preponderance of the evidence.

### 2.  The inadequacy of Suzette's email messages

IDEA empowers parents to "request . . . an initial evaluation to determine if [a] child is a child with a disability." 20 U.S.C. § 1414(a)(1)(B). Based on that provision, the Allens argue that the district's child-find duty was triggered when Suzette "expressed that [Robert] was struggling with his disabilities, repeatedly expressed that his [accommodations were not] working and repeatedly asked for additional help to get [him] support." Dkt. 35 at 14. According to the Allens, many of Suzette's email messages to Robert's teachers and administrators constituted a request for an initial evaluation within the meaning of § 1414(a)(1)(B). Dkt. 35 at 14. Although none of those email messages explicitly asks for Robert to be evaluated, the Allens argue that they were nevertheless sufficient because "the manner of making such a request is not defined" and "[t]here are no 'magic words' for a parent to use when requesting an evaluation." Dkt. 35 at 13–14 (quoting *Charlotte-Mecklenburg Cnty. Bd. of Educ. v. Brady*, 66 F.4th 205, 212 (4th Cir. 2023)).

*Charlotte-Mecklenburg* involved a parent that forwarded an email message from his child's psychologist to the school district. 66 F.4th at 212. The psychologist's email message, which used

17

legal terms of art that were "synonymous with . . . IDEA," stated that the child qualified for special education and asked what services would be available. *Id.* The parent emailed the school district and asked to discuss the psychologist's message. *Id.* The Fourth Circuit found that sufficient, explaining that, even though the parent "did not specifically say 'I request a [special education] evaluation,'" the district would have understood that he was requesting an evaluation. *Id.*; *see also M.W. v. Metro. Sch. Dist. of Lawrence Twp.*, No. 1:18-cv-02698-RLY-TAB, 2021 WL 12251232, at *8 (S.D. Ind. Aug. 12, 2021) (finding an inquiry about "whether [the school] did evaluations for learning," paired with a request "to see if there was any special testing the school could do for a learning disorder or disability," sufficient); *M.D. v. Colonial Sch. Dist.*, 539 F. Supp. 3d 380, 391 n.5 (E.D. Pa. 2021) (involving an evaluation report through which a student's parents "requested 'an assessment of [their child]'").

Suzette's email messages are different. Although some of them mention Robert's ADHD, dysgraphia, depression, or anxiety, none of them makes a request for, or even alludes to, an evaluation, assessment, review, or the like. Nor do any of them contemplate that Robert might need any type of special education.

For example, the Allens point out that, in one email message, Suzette asked whether there was "any assistance . . . available to get [Robert] back on track." Dkt. 35 at 14 (quoting AR 310). That message was to Robert's football coach asking whether there was anything he or the athletics department could do to help. AR 310. It was one of several email messages Suzette exchanged with the coach on that topic, AR 353, 365, 368, 410, because Robert "look[ed] up to the coaches" and she hoped that they could "help make him accountable," AR 320. During his first semester at The Colony High School, Suzette stated that Robert attributed his passing grades to his coaches being "on his tail for eligibility," and she thought that might be the "only thing that is going to motivate him." AR 353. Those email messages ask for help, but they do not ask for a special-education evaluation.

Another email, which the Allens characterize as "raising issues in multiple classes and with ADHD," Dkt. 35 at 14, tells math teacher Jobst that Robert's academic issues might be the result

of his ADHD medicine not being "where it needs to be," AR 324. Suzette apologized, saying that she and Robert were working on getting his medication adjusted. *Id.* That email does not suggest that Robert should be evaluated for special education, but rather that a new prescription would help resolve his problems.

Another email message states: "we need to see what type of accommodations need to be made to potentially take [an] online course or what we can do." Dkt. 35 at 14 (quoting AR 329). But in that message, Suzette was not suggesting that Robert's accommodations were insufficient. She was instead asking how the school could accommodate his failing algebra, i.e., how he could make up the credits. AR 329. None of Suzette's messages asserted that Robert's accommodations were not working—just that they were not being followed, *e.g.*, AR 397, 404, 413, a theory unsupported by record evidence.

None of those messages or any other even contemplates that special education was necessary, much less asks that Robert be evaluated for special education. If Suzette had said something that put the district on notice that she was asking for an evaluation of Robert, like the parents in *Charlotte-Mecklenburg*, *M.W.*, and *M.D.*, she would have triggered the district's § 1414 duties. But a "general expression[] of concern" does not constitute a request for an evaluation. *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 247 n.5 (3d Cir. 2012).

### 3. The irrelevance of the TEA's dyslexia handbook

The Allens also argue that a September 2021 change to TEA's dyslexia handbook triggered the district's child-find duties. Dkt. 35 at 12–13. In support of that contention, they offer a letter from TEA to school administrators explaining that the State's guidance "on evaluation for dyslexia and dysgraphia ha[d] moved to a single pathway for identification under [IDEA]." 504 R. 690. That change meant that, "anytime [a school district] suspects that the student has dyslexia or a related disorder and may need dyslexia intervention services, the [district] must seek parental consent" to evaluate the student for special education. 504 R. 690. The change was meant to ensure that school districts "fulfill[ed] their child find obligations under the IDEA." *Id.*

19

The Allens do not explain why that change triggered the district's child-find duties in Robert's case. A State is required to have in effect "policies and procedures to ensure that [it] meets" its obligations under IDEA. 20 U.S.C. § 1412(a). And in some instances, state law can be relevant to IDEA. *See Zapata*, 2023 WL 7870596, at *3 (explaining that courts look to state law to determine which agency is responsible for providing a child with a FAPE); *Marc V. v. Ne. ISD*, 455 F. Supp. 2d 577, 590 (W.D. Tex. 2006) (applying a state statute of limitations), *aff'd* 242 F. App'x 271 (5th Cir. 2007). But state guidelines, policies, and regulations "do[] not trump the statutory language of . . . IDEA." *Marc V.*, 455 F. Supp. 2d at 594. Because the TEA handbook does not (and could not) supplement the text of IDEA, it cannot save the Allens' IDEA claim.

\* \* \*

A preponderance of the record evidence shows that the district never had a reason to believe that Robert needed special education, so its child-find duty was never triggered. Because of that, the court does not reach the questions of when the district was supposedly put on notice, whether it evaluated Robert within a reasonable time, or whether any failure to fulfill that duty denied him a FAPE. *See Spring Branch ISD*, 961 F.3d at 793; Dkts. 34 at 21–23, 35 at 17–18 (addressing those questions).

### B. Expedited-evaluation duty

The Allens also argue that the district violated its expedited-evaluation duty to determine whether Robert's code-of-conduct violation was a manifestation of his impairments. That argument is based on 20 U.S.C. § 1415(k)(5)(A), which provides that

> [a] child who has not been determined to be eligible for special education and related services under this subchapter and who has engaged in behavior that violates a code of student conduct, may assert any of the protections provided for in this subchapter if the local educational agency had knowledge (as determined in accordance with this paragraph) that the child was a child with a disability before the behavior that precipitated the disciplinary action occurred.

Section 1415(k)(5)(B) provides that

> [a] local educational agency shall be deemed to have knowledge that a child is a child with a disability if, before the behavior that precipitated the disciplinary action occurred—

20

(i) the parent of the child has expressed concern in writing to supervisory or administrative personnel of the appropriate educational agency, or a teacher of the child, that the child is in need of special education and related services;

(ii) the parent of the child has requested an evaluation of the child pursuant to section 1414(a)(1)(B) of this title; or

(iii) the teacher of the child, or other personnel of the local educational agency, has expressed specific concerns about a pattern of behavior demonstrated by the child, directly to the director of special education of such agency or to other supervisory personnel of the agency.

Although the child-find and expedited-evaluation duties are independent, *Spring Branch ISD*, 961 F.3d at 791–92, the same facts that put a district on notice that a child needs special education would reveal that a child is a child with a disability, *see Leigh Ann H.*, 18 F.4th at 795 n.6. The Allens have not met their burden to show that the district had the requisite knowledge here.

As discussed, although some of Suzette's emails expressed general concerns about Robert's grades and emotions, none of them contemplated special education. The first time Suzette brought up special education was in her request for a due-process hearing. AR 18. Suzette also did not request an evaluation under 20 U.S.C. § 1414(a)(1)(B). *See supra* Part I.A.2. And none of Robert's teachers ever mentioned a pattern of behavior that led to his code-of-conduct violation. To the contrary, the district asked his teachers whether they had seen such a pattern, and none of them had. AR 618–23. In short, because the district did not "have knowledge that [Robert] is a child with a disability" within the meaning of 20 U.S.C. § 1415(k)(5)(B), it was not required to make an expedited evaluation. *See Plumbly v. Ne. ISD*, 5:06-cv-00690, 2006 WL 2469169, at *2 (W.D. Tex. Aug. 17 2006) (noting that, "[i]f a local educational agency does not have knowledge that a child is a child with a disability prior to taking disciplinary measures against the child, the child may be subjected to disciplinary measures applied to children without disabilities who engaged in comparable behaviors"). And any procedural defects in an evaluation that the district was not required to make cannot support the Allens' IDEA claim. For that reason, the court need not decide whether Suzette was allowed adequate participation in the manifestation determination,

whether it was timely, or whether it was correct. *See* Dkts. 34 at 24–26, 35 at 22–26 (addressing those points).

## II.  The Rehabilitation Act

Like IDEA, the regulations implementing § 504 of the Rehabilitation Act require schools receiving federal funds to provide children with FAPEs. 34 C.F.R. § 104.33(a) (providing that "[a] recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap"). Under § 504, "appropriate education" means "regular or special education and related aids and services that . . . are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons." 34 C.F.R. 104.33(b)(1). School districts also must place disabled students in the regular educational environment if practical, evaluate students who may need special education, and provide the opportunity for a hearing. *Id.* (incorporating *id.* §§ 104.34, 104.35, 104.36).

Although the "blueprints" for that rule come from IDEA, the district's obligations under § 504 are "less exacting" than those IDEA imposes. *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 529 (7th Cir. 2014) (collecting cases). To demonstrate that a school district denied a child a FAPE under § 504, the plaintiff must show that the district "*effectively* den[ied] a disabled child the benefit of a public education." *Id.* at 530 (emphasis in original) (citing *Alexander v. Choate*, 469 U.S. 287, 301 (1985); *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 746–53 (7th Cir. 2006)); *see Adam J.*, 328 F.3d at 812 (holding that, under IDEA, a child is denied a FAPE when the district's procedural violations "result in the loss of an educational opportunity").

The Fifth Circuit applies a four-factor test to determine whether a child was denied a FAPE. The so-called "*Michael F.* factors" for assessing whether an IEP is reasonably calculated to enable the child to receive educational benefits are whether "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner

22

by the key 'stakeholders'; and (4) positive academic and non-academic benefits are demonstrated." *Klein ISD*, 690 F.3d at 396–97 (quoting *Michael F.*, 118 F.3d at 253). But where, as here, no IEP was implemented at the relevant time, the first two factors are not at issue. *Spring Branch ISD*, 961 F.3d at 795–96 (explaining how the *Michael F.* factors should be applied when the district did not implement a special-education plan).

The third factor revolves around whether the child's education was provided with adequate input from parents, teachers, family members, and other stakeholders. *Klein ISD*, 690 F.3d at 399. Here, the record reflects ample conversations and cooperation among Suzette, teachers, school administrators, coaches, and counselors regarding Robert's grades, accommodations, and emotions. When the Section 504 Committee reviewed Robert's accommodations, Suzette was allowed to review the evaluation and leave comments. AR 249. When Robert earned low grades, Suzette went back and forth with his teachers and assistant principal to plan how he could improve his performance. *E.g.*, AR 397, 400–01, 404, 414. When Robert failed algebra and chemistry for a grading period, Suzette chose how the school would respond. AR 336–41. When Robert got in trouble, Suzette was in direct contact with school leaders. *E.g.*, AR 416, 419–20, 428. And when Suzette thought a non-academic department could lend a hand, Robert's coach was "on it." AR 307. That factor favors the district. *See Michael F.*, 118 F.3d at 253 (finding that the third factor favored the school district because teachers, administrators, and counselors participated in developing a special-education plan).

The fourth factor is the most important. *Klein ISD*, 690 F.3d at 399.  It should be assessed in terms of the child's overall academic record, *id.* at 397, to determine whether his education was "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Rowley*, 458 U.S. at 204. A child is not denied a FAPE just because he has some weaknesses. *See Klein ISD*, 690 F.3d at 397.

As already explained, Robert's academic performance was adequate. He passed almost all of his classes and, when he did not, was given opportunities to make up credits. He enjoyed accommodations for his ADHD and dysgraphia, and his teachers gave him ample opportunities to

complete missing assignments. When he struggled with classes, he had tutoring available, and the school worked with him and Suzette to ensure that his classes were of the right level. Before he stopped attending school, Robert "was able to overall make good grades and pass all subjects." AR 997. He "was on track in fact to graduate [on time]." *Id.* That factor also favors the district. *See Klein ISD*, 690 F.3d at 399 (finding that the fourth factor favored the school district because, viewed holistically, a student "obtained a high school level education that would have been sufficient for graduation").

In sum, neither of the applicable *Michael F.* factors supports a finding that Robert was denied a FAPE. No genuine issue of material fact exists as to whether Robert was effectively denied the benefit of a public education, so the district is entitled to judgment as a matter of law on the Allens' Rehabilitation Act claim.

## CONCLUSION

It is **ORDERED** that:

1) the district's motion for judgment on the administrative record, Dkt. 34, is **GRANTED**;

2) the Allens' motion for judgment on the administrative record, Dkt. 35, is **DENIED**;

3) the decisions of the special-education hearing officer, AR 1–17, and the third-party § 504 hearing officer, 504 R 1350, are **AFFIRMED**; and

4) the complaint, Dkt. 1, is **DISMISSED WITH PREJUDICE**.

So **ORDERED** and **SIGNED** this 27th day of March, 2026.



Bill Davis
United States Magistrate Judge